JEREMIAH VAN RENSSELAER, APPELLANT, *v.* PHILIP KEARNEY AND FREDERIC DE PEYSTER, TRUSTEES AND EXECUTORS OF JOHN WATTS, DECEASED, CATHERINE G. VISSCHER, CORNELIUS G. VAN RENSSELAER, AND GLEN VAN RENSSELAER, DEFENDANTS.

In 1786 the legislature of New York passed a law declaring that " all estates tail shall be, and hereby are, abolished "; and if any person should thereafter become seized in fee tail of any lands, tenements, or hereditaments by virtue of any devise, &c., he should be deemed to have become seized in fee simple absolute.

Van Rensselaer *v.* Kearney et al.

This included an estate tail in remainder, as well as one in possession. The courts in New York have so decided, and this court adopts their construction.

The remainder-man dying during the lifetime of the life tenant, the latter, being the father, inherited from the son a fee simple absolute.

Whilst the remainder-man was yet alive, the life tenant sold the property and conveyed it to the vendee by a deed which, according to its true construction, affirmed the existence of an estate in fee simple in itself. The reasons for this construction stated.

Those claiming under him are estopped by this deed. The doctrine of estoppel explained.

THIS was an appeal from the Circuit Court of the United States for the Southern District of New York, sitting as a court of equity. It was a bill filed by the appellant, Jeremiah Van Rensselaer, against John Watts originally, and continued against his trustees and executors, praying for an account of the rents of certain property, and for the surrender of the leases, title-deeds, &c.

In order to see at a glance the derivation of the title, the following table is referred to: —

\* The testator, died 1783.
† Dead at the date of the will.
‡ The devisee, died 1828.

§ Born 1791, died 1813, without issue.
‖ The complainant, born 1793.

On the 25th of May, 1782, John Van Rensselaer was seized of a large body of land, about thirty-four thousand acres, a part of which had been leased on permanent ground rents, and a part leased for life or for years. The residue was owned by him in fee simple. On that day he made and published his last will and testament, by which he devised Claverack Manor to trustees during the life of John J. Van Rensselaer, his grandson, with the intent to create an estate tail, the rents and profits to the use of John J. Van Rensselaer during his lifetime and the remainder over to the issue male of the said John, and in case of failure of such issue, then to the issue male of the other sons of the testator. Provision was then made for raising portions for female issue.

On the 12th of July, 1782, a law was passed in New York abolishing entails, and on the 29th of July, 1782, the testator added a codicil to his will, alluding to the law.

In 1783 the testator died, and John J. Van Rensselaer, the devisee, entered into possession of the estate.

On the 23d of February, 1786, the legislature of New York passed an act (3 R. S. N. Y., 1st ed., App. 48; 1 R. L. 1813, p. 52), declaring " That all estates tail shall be, and hereby are, abolished; and that, in all cases where any person or persons now is, or, if the act hereinafter mentioned [referring to the act passed on 12th July, 1782] had not been passed, would now be, seized in fee tail of any lands, tenements, or hereditaments, such person and persons shall be deemed to be seized of the same in fee simple absolute; and further, that in all cases where any person or persons would, if the said act and this present act had not been passed, at any time hereafter become seized in fee tail of any lands, tenements, or hereditaments, by virtue of any devise, gift, grant, or other conveyance heretofore made or hereafter to be made, or by any other means whatsoever, such person or persons, instead of becoming seized thereof in fee tail, shall be deemed and adjudged to become seized thereof in fee simple absolute."

In 1791 John was born, who was the first-born son of the devisee. It may as well be mentioned here, that he died in 1813, leaving his father surviving him. After John there were born other children, viz. Jeremiah, who was the complainant below and appellant here, Catherine, who intermarried with one Visscher, Glen, and Cornelius.

In 1794, the condition of the estate was this. Much the larger proportion of it was held under leases, which had been made to different persons at different times, and the residue was held by John J. Van Rensselaer. The leases were, some of them, executed by Hendrick Van Rensselaer and John Van

Rensselaer, the ancestors of the said John J.; and some executed by John J. Van Rensselaer himself. These leases for the most part created perpetual ground rents, and those which did not create perpetual ground rents were for the lives of the lessees. Two mortgages upon the property had also been given by John J. Van Rensselaer to Philip Schuyler, for three thousand one hundred pounds each.

This being the state of the property in 1794, John J. Van Rensselaer entered into an agreement with Daniel Penfield, on the 4th of November of that year. As these articles were much discussed in the argument, it is proper to make extracts from them as to those points which were the subject of discussion.

"Articles of agreement had, made, entered into, and finally concluded upon this fourth day of November, in the year of our Lord one thousand seven hundred and ninety-four, by and between John J. Van Rensselaer of Greenbush, in the county of Rensselaer, of the one part, and Daniel Penfield of the city of New York, of the other part, witnesseth: Imprimis, the said John J. Van Rensselaer, for himself, his heirs, executors, and administrators, doth covenant, grant, and agree, to and with the said Daniel Penfield, his heirs, executors, and administrators, that he, the said John J. Van Rensselaer, together with Catherine, his wife, shall and will, within the term of three months from the date hereof, by a good and sufficient deed and conveyance in the law, such as by the counsel of the said Daniel Penfield, his heirs or assigns, shall be reasonably advised, devised, or required, and that free and clear, and freely acquitted and discharged of and from all encumbrances and charges, other than leases heretofore given by the said John J. Van Rensselaer and his ancestors, assign, release, convey, assure, bargain, sell, grant, and confirm unto the said Daniel Penfield, his heirs and assigns for ever, all the right, title, interest, property, claim, and demand, either in possession, reversion, or remainder, of him, the said John J. Van Rensselaer and Catherine, his wife, of, in, or to all that tract and parcel of land situate, lying, and being in the town of Claverack, and city of Hudson, and county of Columbia, and included within the boundaries following, to wit, that is to say: Beginning," &c., (going on to describe the land,) "together with all and singular the waters, watercourses, and streams of water, profits, advantages, hereditaments, and appurtenances whatsoever thereunto appertaining and belonging, or which have been considered and used, or now are used and occupied, as part and parcel thereof, in as full and ample a manner as the said John J. Van Rensselaer now hath and enjoyeth the same, and in as

full and ample a manner as the same have heretofore been had and enjoyed by the said John J. Van Rensselaer, or lawfully may be had, used, occupied, possessed, and enjoyed by him, his heirs or assigns: To have and to hold the same unto the said Daniel Penfield, his heirs and assigns for ever, excepting, reserving, and saving thereout all the land included within the foregoing and above-described boundaries, which have been heretofore granted," &c. (going on to enumerate the leases made and agreed to be made).

Then followed covenants on the part of Penfield to pay for the quantity of land, to pay the mortgages to Schuyler, to secure the payment of the instalments by mortgage, to execute leases to the persons with whom John J. had agreed that leases should be made, and other covenants, which it is not material to state.

On the 1st of January, 1795, John J. Van Rensselaer and Catherine, his wife, executed the deed to Penfield, in conformity with the above articles. The deed is short, and, as many parts of it were criticized in the argument, it may be proper to insert it entire.

" This indenture, made the first day of January, 1795, between John J. Van Rensselaer, of the county of Rensselaer and State of New York, esquire, and Catherine, his wife, of the one part, and Daniel Penfield, of the city of New York, esquire, of the other part: Whereas certain articles of agreement, indented, were made and executed by and between the said John J. Van Rensselaer of the one part, and the said Daniel Penfield of the other part, bearing date the fourth day of November last past, in the words following, to wit: Imprimis, the said John J. Van Rensselaer, for himself, his heirs, executors, and administrators, doth covenant, grant, and agree, to and with the said Daniel Penfield, his heirs, executors, and administrators, that he, the said John J. Van Rensselaer, together with Catherine, his wife, within the term of three months from the date hereof, by a good and sufficient deed and conveyance in the law, such as by the counsel of the said Daniel Penfield, his heirs or assigns, shall be reasonably advised, devised, or required, and that free and clear, and freely acquitted and discharged of and from all encumbrances and charges other than leases heretofore given by the said John J. Van Rensselaer and his ancestors, assign, release, convey, assure, bargain, sell, grant, and confirm unto the said Daniel Penfield, his heirs and assigns for ever, all the right, title, interest, property, claim, and demand, either in possession, reversion, or remainder, of him, the said John J. Van Rensselaer,

and Catherine, his wife, of, in, or to all that tract and parcel of land, situate, lying, and being in the town of Claverack, and city of Hudson, in the county of Columbia, and included within the boundaries following, to wit, that is to say: Beginning at the mouth of Major Abraham's or Kinderhook Creek; thence running south eighty-four degrees and thirty-eight minutes east, ten miles; thence running south forty degrees west, as far as the right of John Van Rensselaer, the grandfather of the said John J. Van Rensselaer, extended; from thence to Wahankasick; and thence up Hudson River to the place of beginning; together with all and singular the waters, watercourses, and streams of water, profits, advantages, hereditaments, and appurtenances whatsoever thereunto appertaining or belonging, and which have been considered and used, or now are used and occupied, as part and parcel thereof, in as full and ample a manner as the said John J. Van Rensselaer now hath and enjoyeth the same, and in as full and ample a manner as the same have heretofore been had and enjoyed by the said John J. Van Rensselaer, or lawfully may be had, used, occupied, possessed, and enjoyed by him, his heirs or assigns: To have and to hold the same unto the said Daniel Penfield, his heirs and assigns for ever, excepting, reserving, and saving thereout all the land included within the foregoing and above-described boundaries, which have been heretofore granted by letters patent prior to the grants, patents, and confirmations under which the right and title of the said John J. Van Rensselaer is derived; excepting also all lands sold or granted otherwise than by lease by the late John Van Rensselaer, deceased, and the aforesaid John J. Van Rensselaer, and all the lands granted by lease from the said John Van Rensselaer, deceased, to Robert Van Rensselaer, situate, lying, and being in the said town of Claverack, in the county of Columbia; and excepting also the quantity of fifty acres of woodland, to be granted by the said Daniel Penfield to Henry J. Van Rensselaer, and situate within the boundaries before mentioned and described, and to be by them agreed on; and excepting, also, all that tract of land situate in the city of Hudson and town of Claverack, formerly devised by Hendrick Van Rensselaer to Henry Van Rensselaer, deceased; and excepting, also, the farm of land in possession of the representatives of Eytie Moore, deceased, and by the said John J. Van Rensselaer conveyed to John Van Rensselaer, which said deed shall be duly acknowledged by the said John J. Van Rensselaer and Catharine, his wife, pursuant to the act in such case made and provided, as in and by the said articles of agreement, relation being thereunto especially had, may among other things more fully appear.

Van Rensselaer v. Kearney et al.

" Now, therefore, this indenture witnesseth, that the said John J. Van Rensselaer and Catharine, his wife, for and in consideration of the sum of forty-four thousand five hundred and fifty dollars to them in hand paid, the receipt whereof they do hereby acknowledge, and therefrom release and discharge the said Daniel Penfield, his heirs and assigns, have granted, bargained, sold, aliened, enfeoffed, assured, released, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, assure, release, and confirm, unto the said Daniel Penfield, (in his actual possession now being, by virtue of a bargain and sale to him thereof made for one whole year by the said John J. Van Rensselaer, by indenture bearing date the day next before the day of the date of these presents, and by force of the statute for transferring uses into possession,) and to his heirs and assigns for ever, all and singular the aforesaid tract of land above described, lying and being in the town of Claverack and city of Hudson, and so butted and bounded as is above particularly mentioned, together with all and singular the waters, watercourses, and streams of water, profits, advantages, hereditaments, and appurtenances whatsoever thereto appertaining and belonging, or which have been considered and used, or now are used and occupied, as part and parcel thereof, excepting, reserving, and saving thereout all the lands included within the foregoing and above-described boundaries, which are excepted, saved, and reserved in the said in part recited articles of agreement ; which said tract of land, after deducting the said exceptions, reservations, and savings, contains the quantity of thirty-three thousand six hundred and fifty-eight acres of land, and the reversion and reversions, remainder and remainders, rents, issues, services, and profits thereof, and also all leases of and concerning any part or parts of the said granted premises ; and also all the estate, right, title, interest, property, possession, claim, and demand of them, the said John J. Van Rensselaer and Catherine, his wife, of, in, and to the same : To have and to hold the said tract of land so described, and so butted and bounded as above recited, excepting, saving, and reserving, as are above particularly excepted, saved, and reserved, unto the said Daniel Penfield, his heirs and assigns, to the only proper use and behoof of the said Daniel Penfield, his heirs and assigns for ever, in as full and ample a manner as the said John J. Van Rensselaer now hath and enjoyeth the same, and in as full and ample a manner as the same hath heretofore been had and enjoyed by the said John J. Van Rensselaer, or lawfully might, if these presents were not made, be had, used, occupied, possessed, and enjoyed by him, his heirs or assigns. And the said John J. Van Rensselaer, for himself, his heirs, executors.

and administrators, doth covenant, grant, and agree, to and with the said Daniel Penfield, his heirs and assigns, in manner following, that is to say : that the said tract of land described, butted and bounded as aforesaid, excepting, saving, and reserving as above are excepted, saved, and reserved, is free and clear, and shall and may be held and enjoyed by the said Daniel Penfield, his heirs and assigns, according to the true intent and meaning of these presents, freely and clearly acquitted and discharged of and from all encumbrances and charges, other than leases heretofore given by the said John J. Van Rensselaer and his ancestors, or any of them, and except a certain mortgage upon the premises executed by the said John J. Van Rensselaer to Philip Schuyler, esquire, dated the 11th day of August, 1791, to secure the payment of three thousand one hundred pounds.

" In witness whereof the parties to these presents have hereunto interchangeably set their hands and seals, the day and year first above written.

" JOHN J. VAN RENSSELAER,    [L. S.]
CATHERINE VAN RENSSELAER. [L. S.] "

On the 15th of October, 1806, Penfield and wife conveyed all the property to John Watts, enumerating in the deed all the leases, which were to stand good.

In 1813 John Van Rensselaer, the eldest son of John J., died, without issue.

On the 26th of September, 1828, John J. Van Rensselaer, who had sold the property to Watts, died also.

At some time previous to the year 1836, but when the record did not show, Jeremiah Van Rensselaer, a citizen of New Jersey, being the eldest surviving son of John J., filed his bill in the Circuit Court of the United States for the Southern District of New York, against John Watts, and against Catherine G. Visscher, Cornelius G. Van Rensselaer, and Glen Van Rensselaer. In the bill he alleged that all the estate and interest which John J. Van Rensselaer acquired under the will of his grandfather was an estate for his own life merely, and that the said John J. was unable to vest, and did not vest, any greater interest in Penfield. Claiming the whole estate, he called upon Watts for an account of the rents and profits, and for a surrender of the title papers.

As to his brothers and sister the bill proceeded thus : —

" Your orator further charges, that the said Catherine G. Visscher, Cornelius G. Van Rensselaer, and Glen Van Rensselaer, who are citizens of the State of New York, give out and pretend that the said John J. Van Rensselaer had a son named

John Van Rensselaer, who, as they allege, was born in the year 1791, and died in the year 1813; and they further allege, that upon his birth the said estate, devised to the eldest son of the said John J. Van Rensselaer in and by the said will, vested in the said John Van Rensselaer; and that, by the operation of law, it was turned into an estate in fee, and descended, upon the death of the said John Van Rensselaer, to the said John J. Van Rensselaer; and that upon the death of the said John J. Van Rensselaer, in the year 1828, it descended to his heirs at law as tenants in common, whereby, as they allege, they are each entitled to a fourth part of the said estate, and to the rents and profits accruing thereupon. Whereas your orator charges, that the said estate, and the rents and profits thereof, belong to him."

The bill then prayed that the complainant might be quieted in his title to the whole of the premises, or, in case it should be decided that he was entitled only to one fourth part, then that the court would decree accordingly.

The brothers and sister answered, admitting the facts stated in the bill, and submitting themselves to the judgment of the court.

Watts put in a plea, denying all knowledge of any title except that of Penfield at the time of his purchase, and prayed that he might not be compelled to answer further. The court allowed the plea to stand as to the discovery, but ordered a further answer as to the title.

In September, 1836, John Watts died, leaving Philip Kearney and Frederic De Peyster his executors. A supplemental bill and bill of revivor was then filed, making them parties, and also Philip Kearney, Jr., Susan Kearney, and John Watts De Peyster, the devisees of the property in question. The new parties answered, and sundry exhibits were filed and depositions taken. In May, 1846, the cause came on for argument in the Circuit Court, which passed the following decree. Judge Nelson being unable to attend from sickness, the decree was given by Judge Betts.

" First. That the remainder in tail, in the premises mentioned in the pleadings in this cause, created by the will of John Van Rensselaer the elder, vested in John, his great-grandson, on his birth, in the year 1791, and that said great-grandson was seized of such remainder.

" Second. That the tenant in tail under the said will, acquiring such estate in remainder, became thereby so seized of the lands, tenements, and hereditaments devised that the act of February 23d, A. D. 1786, converted such estate tail into a fee simple absolute.

26 *

" Third. That the said John, the great-grandson of the said John Van Rensselaer the elder, took the estate in question as a purchase, and thus became a new stock of descent, and was so seized thereof, that, at his death, in the year 1813, the whole estate descended to his father, John J. Van Rensselaer, and his heirs at law.

" Fourth. That the covenants in the deed of John J. Van Rensselaer, conveying the premises in question to David Penfield, bearing date the 1st day of January, A. D. 1795, amount in law to a covenant against all encumbrances, except such as are specifically designated in the said deed, and also to a covenant for quiet enjoyment, subject only to the like exceptions.

" Fifth. That the said covenants in the said deed operate as an estoppel to John J. Van Rensselaer's claiming the estate subsequently acquired by him, as against his grantee; and that the estoppel operates equally against the complainant in this suit, who makes title to the estate in question as one of the heirs at law of John J. Van Rensselaer.

" Sixth. That the deed of Daniel Penfield to John Watts, bearing date the 15th day of October, in the year 1806, conveying the said estate to the said John Watts in fee, with full covenants, entitles his devisees and representatives, now in possession of the premises, and who are defendants in this cause, to a decree dismissing the complainant's bill in this cause, with costs.

" It is therefore ordered, adjudged, and decreed by this court, that the complainant's said bill of complaint be, and the same hereby is, dismissed; and that the said complainant pay to the said defendants or their solicitor their costs of this suit, to be taxed, and that the said defendants have execution therefor according to the course and practice of this court.

(Signed,)                                         SAMUEL R. BETTS."

The complainant appealed to this court. It was argued by *Mr. Webster* and *Mr. Blunt*, for the appellant, and *Mr. Jordan* and *Mr. Wood*, for the appellees.

The case was argued at great length, and the reporter can only state the points raised by the respective counsel.

On the part of the appellant, the points were the following.

In case the decision lately made by the New York court in Van Rensselaer v. Poucher is to be examined here, pursuant to the rule established in Lane et al. v. Vick et al., 3 Howard, 476, then the first question is, When was the estate tail created by the will converted into a fee, — at the time of the birth of the eldest son, or at the death of John J. Van Rensselaer, in 1828?

Taking that view of the case, the following points are presented for the appellant: —

First Point. John Van Rensselaer, the first-born son of John J. Van Rensselaer, was the first donee in tail, under the will of Colonel John Van Rensselaer, the devisor.

I. The devise to Morris and Douw, in trust to support the contingent remainders, &c., vested in the trustees a legal estate during the life of John J. Van Rensselaer, the grandson of the devisor. The said John J. Van Rensselaer took only an equitable estate for life, which could not unite with the legal remainder subsequently devised to his sons successively in tail male.

II. Even if the estate of John J. Van Rensselaer was executed by the statute of uses, as a legal estate in him, still it was an express estate for his own life only, and would not, under the rule in Shelley's case, unite with the remainders subsequently devised to his sons successively in tail male, and so create an estate tail in him. The sons thus designated take as purchasers, and not by descent. Lilly's Practical Conveyancer, 727; 2 Bl. Com., App. No. 2; Scarborough v. Saville, 3 Adolph. & Ell. 897; 24 Com. Law, 271; Hays on Estates Tail, p. 118; 2 Bl. Com. 171, notes; 9 Serg. & Rawle, 362; Willes, 336; Dickens, 183, 195; 35 Com. Law, 246; Butler's Notes to Co. Litt., No. 249, subd. 2, 3; Bacon's Works, 599; Touchst. 501; Lewin on Trusts, 2,356, 103, note 1; Cornish on Uses, 15, 61; 1 Ves. & Beames, 485; 16 Ves. 296; 2 P. Wms. 680; 4 T. R. 247; 3 Bro. P. C. 464; 4 Kent's Com. 215, 221; Hays on Estates Tail, Proposition 4, pp. 4, 30, 31, 43; 4 Dane's Abr. 633; 3 Wend. 504; 2 Cruise's Dig. 39, tit. 16, ch. 7, § 26.

Second Point. John, the first-born son of John J. Van Rensselaer, took at his birth a vested remainder in fee tail; but as he died in the lifetime of his father (for whose life the trustees held), he never became "seized in fee tail of the lands, tenements, and hereditaments" devised, within the true intent and meaning of the statutes of 1782 and 1786, for the abolition of entails in New York. 1 Rev. Laws, 1813, p. 52.

I. The question arises upon well-known technical words; and they must be construed conformably to their established import. 6 Bac. Abr. 380, Statute, I. 2; 2 Cranch, 386; Ellmaker v. Ellmaker, 4 Watts, 89; Rutherforth's Institutes, book 2, ch. 7, § 4.

II. If upon the words the construction be doubtful, it will be proper to consider the preëxisting law, the evil to be remedied, the nature of the remedy designed, and the true reason of that remedy. 6 Bac. Abr. 383, Statute, I. 4.

III. The public history of the times in which the acts were passed may be resorted to.    Aldridge v. Williams, 3 Howard, 24.

IV. Entails, as practised in England, and in this State prior to the acts in question, did not unduly suspend the power of alienation, but only embarrassed it by compelling a resort to the dilatory and expensive method of conveyance by fine and recovery.    Spencer v. Lord Marlboro, 5 Bro. P. C. 592; 3 Tucker's Bl., p. 116, note 11, p. 363, note 7; Pigott on Rec. 20; Cruise on Fines and Rec., ch. 1, § 6; 2 Rev. Stat. 343, § 24; Str. 295; 1 Burr. 115; Willes, 453; 5 T. R. 108; 2 Bl. Com., App. No. 4, 5; 2 Bl. Com. 353, 355; 2 Wooddeson, 186, 187, 188, 198; 2 Chitty's Blackstone, p. 357, note 18; 24 Com. Law, 59; Parkhurst v. Dormer, Willes, 327; 13 East, 495; Taylor v. Horde, 1 Burr. 60; 30 Com. Law, 271; 8 Mass. 36; 2 Rawle, 175; 14 Geo. 2, ch. 20; 3 Bl. Com. 362; Wilson's Pigott on Rec. 27, 41; Cowp. 704; 2 Burr. 1067; 2 Wooddeson, 198; 4 Kent's Com. 18, 22, note b; 3 Call, 287; 14 Wend. 295, 334; 1 Jefferson's Misc. 34.

V. No evil, except the necessity of fines and common recoveries, was supposed to result from entails.   Lord Mansfield, 1 Burr. 115; 3 London Law Mag. 371; Doctor and Student, ch. 32, 95; 2 Bl. Com. 361, A. D. 1765; 9 Serg. & Rawle, 339, 354; 4 Jefferson's Misc. 178.

1. In the sister States it was so considered, and their contemporaneous legislation conforms to this idea.   See review of such legislation at end of points.

2. Fines and recoveries were at length dispensed with in England, 3 and 4 Wm. IV. ch. 74; 2 Chitty's Gen. Prac., Supplement, 79, 80.

3. The legislature of New York never attempted to curtail the power of suspending alienation until the Revised Statutes of 1830.   It was not an object of the acts in question.   Costar v. Lorrillard, 14 Wend. 294, 334.

4. Nor was the power then curtailed in a greater degree than it is curtailed by the plaintiff's construction of the acts in question.

VI. The terms of the acts, if construed literally and strictly, according to their fixed technical meaning, produce an effect precisely corresponding with the presumable intent of the legislature, as deducible from a review of the preëxisting law, the only acknowledged evil of entails, and the whole history of contemporaneous remedial legislation.

1. The remainder-man in fee tail never had at common law the absolute power of alienation, even by common recovery. He might bar his own issue by a fine, but he could not affect

the subsequent remainders. 2 Chitty's Blackstone, p. 357, note 18. He might unite with the tenant for life in suffering a common recovery, and thus bar the entail; but the assent of the freeholder was indispensable. See cases before cited. 2 Bl. Com. 362.

2. The acts in question accordingly require, at the moment when they convert the fee tail into a fee simple, a seizin in fee tail of the lands, tenements, or hereditaments. Meaning of word *Hereditament.* Symonds, 385; Thos. Coke, 197 to 242; Co. Litt. 6 a, 20, Hargrave's notes, 2 and 24; 2 Tomlyns, 86; 3 Tomlyns, 578; 1 Bouvier, 629; 2 Bouvier, 554; 2 Bl. Com. 17 to 48; 4 Dane's Abr. 500; 3 Kent's Com. 401; Cruise's Dig., book 1, tit. 1, § 1; 2 Chitty's Gen. Prac. 153; Flintoff, ch. 2, 3; Maugham, ch. 1; Roscoe on Real Actions, p. 16; Wood's Inst. ch. 1, 2, 3, 4, and p. 113; 1 Finch's Law, 111; Termes de la Ley, 254; Salk. 685, 239; 8 T. R. 503; 5 T. R. 558; 1 Bos. & Pul. 562; 2 Bos. & Pul. 247; Moseley, 240; 10 Wheat. 216; 9 Serg. & Rawle, 356; 6 Bac. Abr. 382, *Statute,* I. 4; Johnson's Dict.; Ainsworth's Dict., *Hæredium;* 2 Croker's Dict., *Hereditament;* 8 Enc. Brit. 473; 1 Rich. 3, ch. 7; 4 Hen. 7, ch. 14, 24; 11 Hen. 7, ch. 1, 20; 1 Hen. 8, ch. 8; 21 Hen. 8, ch. 4, 13, 15, 19; 32 Hen. 8, ch. 9, 32, 36; 34 & 35 Hen. 8, ch. 5, 40, 42; 11 & 12 W. & M., ch. 4; 3 and 4 Anne, ch. 6; 4 Stat. at Large, 110, 137, 217, 220, 420; 6 Ib. 64; Holt's Laws of N. Y., p. 85, § 1; Ibid., p. 258, § 4; 1 Rev. Stat. 507; 2 Rev. Stat. 317, § 1; 9 Cow. 564; 2 Cow. 497; 3 Paige, 245; 1 Rev. Laws of 1813, p. 363; 1 Rev. Laws, 747, §§ 23, 24, 25.

3. The word "*seized*" in these acts is not to be taken singly, but in conjunction with that of which the seizin is required, i. e. the lands, tenements, or hereditaments, i. e. the *res* or subject. Co. Litt. 14 b, 15 a, 17 a, 152 b; 3 Tomlyn's Dict. 446, *Seizin;* 2 Bouvier's Dict. 494, *Seizin;* 14 Johns. 407; 4 Dane's Abr. 664, § 5; Jackson *v.* Strang, 1 Hall, 32; Litt. §§ 541, 549, 235, 233; *Of a Rent,* Litt. 565; Co. Litt. 315 a; 5 Barn. & Cresw. 308; Bevil's case, 4 Coke, 9; *Form of Pleading,* Litt. 10; 2 Bl. 209.

4. The word "*seized*" is not here used in that secondary sense in which it serves to describe the condition of a remainderman or reversioner in respect to his estate, when such estate, not discontinued by any act or neglect of the freeholder having the precedent estate, is perfect and unharmed, and simply awaits the determination of the precedent estate to vest in possession. Even in that case it is never said that the remainderman or reversioner is seized of the lands, &c. But it is frequently said that he is seized of the remainder, or of his estate. Co. Litt. 347 b; 1 Burr. 107, 109; 4 T. R. 744; Litt. 451,

---

---

470, 673; 2 Bl. 357; Doe *v.* Cooper, 2 Barn. & Adolph. 283; Davis *v.* Gatacre, 5 Bingh. N. C. 609; 8 East, 566; Roscoe on Real Actions, 51 – 290; Stat. Champerty, 2 Rev. Stat. 691, § 6; Stat. Trespass, 1 Rev. Laws, 527, § 32; 1 Rev. Stat. 750, § 8.

  5. It is an error to say "seizin of land" should not be pleaded. On the contrary, seizin of lands is always pleaded where it exists. In replevin, and many other cases, "in fee," or "in fee tail," or "for life," according to the fact, is added, because, in addition to seizin, the title is required to be pleaded. No instance can be found of an averment, that a party was "seized of land in remainder."

6. It is an error to suppose that seized "in fee," or "in his demesne as of fee," is used indifferently or confusedly in pleading the seizin of a remainder-man. 2 Denio, 23. The first form is proper when the remainder-man is not the freeholder (the prior estate being for life); the second form is proper when the remainder-man is the freeholder (the prior estate being for years only). And so are all the cases and precedents. Com. Dig. *Pleader,* c: 35; 6 Jacob's Dict. 41; Tomlyn's Dict. 41, *Seizin;* Greer e *v.* Cole, 2 Saunders, 235; 7 N. Hamp. 59.

VII. The intent of the legislature was to seize upon the entail the instant there was in being an owner having a right by the will or settlement to acquire an absolute fee simple, and, dispensing with the formal and dilatory process of fine and recovery, to vest such fee simple at once by act and operation of law; thus, —

  1. The only recognized evil of entails was remedied.

2. No violent or sudden change, overturning the lawful intent of the devisor or donor, was effected.

  3. The consistency and harmony of the law was preserved.

VIII. Unless this is the construction, these statutes would be incongruous in their action, and would work injustice.

1. A seizin of the lands, &c., in fee simple absolute, would necessarily annihilate the precedent freehold. 2 Bl. Com. 104, 105.

2. There are commonly, in settlements in tail, ten or more successive limitations in tail. In each limitation the remainder is vested, and the remainder-man is seized of the remainder or estate the instant he comes into being. Fearne on Remainders, 217 to 221; Willes, 338. And consequently, if a seizin of the estate, i. e. the vested remainder, be sufficient, each of these remainders is, at the same instant, turned into a fee simple absolute, and made to destroy all the others.

  3. This incongruity would not be advantageously obviated, if, by construction, a priority could be given to the first vested

remainder; because it often happens that the remainders, posterior in point of limitation, vest long before the prior remaindermen come into being. It was a common practice to settle to the use of an infant grandson for life, remainder in fee tail to his first and other sons successively, remainder in default, &c., to the use of settler's brother or uncle, remainder to the first and other sons of such brother or uncle, in tail. Here the last remainder is almost sure to vest before the former.

IX. The construction contended for by the plaintiff involves none of these incongruities, is according to the technical import of the words, the reason of the thing, and the construction in analogous cases.

1. A seizin of lands in fee tail entitled the wife to dower and the husband to courtesy; but seizin of a vested remainder in fee tail or in fee simple had no such effect. 1 Barbour's S. C. R. 506; Cornish on Remainders, 130; Watkins on Conveyancing, 44, 56; 2 Wooddeson's Lectures, 15, 17; Eldredge v. Forrestal, 7 Mass. 253; Acc. 23 Pick. 84; 22 Pick. 284; In re Cregier, 1 Barbour's Ch. R. 601; 4 Mason, 485; Dower Act, 1 Rev. Laws, 56, § 1; 4 Dane's Abr. 658, 663, § 22.

2. An heir, to whom a dry remainder expectant upon an estate for life descended, might, at common law, plead *riens per discent* to an action on his ancestor's bond debt. Fortrey v. Fortrey, 2 Raithby's Vernon, 134.

3. The words "where any lands, tenements, or hereditaments shall be held," in the statute of partitions, were held not to authorize a naked remainder-man or reversioner to be a plaintiff. 1 Rev. Laws, 507, § 1; Clapp v. Bromagham, 9 Cow. 564; 3 Paige, 245; 2 Cow. 497.

4. The statute of wills gave the power of devising to every person "having any estate in lands, tenements, or hereditaments." 1 Rev. Laws, 361.

5. The statute of executions subjects to levy and sale "all and singular the lands, tenements, and real estate" of the debtor. 1 Rev. Laws, 500, § 1.

6. See also the English statute subjecting the estates tail of bankrupts to their debts. 2 Bl. Com. 261 – 286.

7. The argument founded on a supposed unity of design in the first and third sections, in reference to the maxim *Seisina facit stipitem*, is unsound; for that maxim related only to descent in fee simple, and never had any application to estates tail. There the descent was *per formam doni*. 5 Bl. Com. 231, 232, 233; Chitty on Descents, 155; Co. Litt. 14 b, 15 b; Pigott on Recoveries, 108; 4 Com. Dig., *Estates*, B. 7; 8; 15 Maine, 412; Ratcliffe's case, 3 Coke, 41, 42.

8. The word "possessed" in the second section throws no

light upon the present question. It has no connection with the object of the first section. It is a statute of repose, like the statute of limitations; and it includes terms for years, where no seizin could exist. Such statutes are always made in favor of the actual possessor, and to cure defects of title, or a want of seizin. 1 Rev. Laws of N. Car. 258, § 1; 2 Haywood, 142; Best on Presumption, § 76; 2 Halstead, 177; Wood's Institute, book 2, ch. 1, p. 115; 2 Wooddeson's Lectures, 13, 178; 1 Hilliard's Abr., ch. 2, § 16, p. 24; Litt. 234; Co. Litt. 200 b, 17 a.

X. Contemporaneous legislation in the State of New York conforms to the construction contended for by the plaintiff.

1. The act of attainder (Holt's Laws of New York, p. 85, A. D. 1779) forfeits all the real estate of the delinquents.

2. Sect. 4 of the first act abolishing entails, not reënacted in 1786, (Holt's Laws of New York, p. 258,) shows that the legislature, in that act, attached a more extensive meaning to the words "real estate," than to "lands, tenements, and hereditaments." The distinction is also observed in section sixth of the act of 1786. 1 Rev. Laws, 53, § 6.

3. Fines and common recoveries were preserved, and regulated by statute (10th Sess., chap. 43), which shows that estates tail were not instantly and totally annihilated by the acts in question.

*a.* They were invented and used to bar entails, and scarcely ever, if at all, used for any other purpose. Pigott on Recoveries, 20; 3 Tucker's Blackstone, 116, note 11, p. 363, note 7.

*b.* When, in 1830, all estates tail, though not clothed with seizin, were either converted or extinguished, fines and recoveries were very properly abolished. 1 Rev. Stat. 752, §§ 3, 4; 2 Rev. Stat. 343, § 24.

Third Point. The plaintiff, upon the death of his elder brother without issue, in 1813, became the first remainder-man in fee tail. And on the death of his father, in 1828, he became seized in fee tail of the "lands, tenements, and hereditaments" devised; which seizin the statute of 1786 instantly converted into a fee simple absolute.

Supposing, however, the estate was converted into a fee on the birth of his eldest son, John J. Van Rensselaer would not take a fee until the death of that son, in 1813, when it would become his by descent.

The appellant contends that the reversion would, upon his death, in 1828, descend to his four children, the appellant and his brothers and sister.

Fourth Point. The deed from John J. Van Rensselaer to Daniel Penfield contained warranty, nor any covenant, ex-

cept one against encumbrances. A title subsequently acquired by grantor does not enure to the benefit of grantee. Jackson v. Winslow, 13 Cowen, 18 ; Pelletreau v. Jackson, 11 Wend. 116 (opinion to this precise effect delivered by Judge Nelson, subsequently affirmed) ; Jackson v. Waldron, 13 Wend. 212 ; Jackson v. Hubbell, 1 Cowen, 616 ; McCrackin v. Wright, 14 Johns. 194 ; Jackson v. Bradford, 4 Wend. 622 ; Jackson v. Peck, 4 Wend. 305 ; Dart v. Dart, 7 Cowen, 256 ; Jackson v. Natsdorf, 11 Johns. 97, per Thompson, J. ; Trull v. Eastman, 3 Metcalf, 124.

The deed to Daniel Penfield was executed in pursuance of an agreement between the parties. In construing them, both instruments are to be taken together to arrive at the meaning of the parties. Beaumont v. Bramley, 1 Turn. & Russ. 52 ; Proctor v. Pool, 4 Dev. 373 ; Crone v. Odell, 1 Ball & Beat. 489 ; Moore v. Jackson, 4 Wend. 67 ; Atkinson v. Pillsworth, 1 Ridg. P. C. 461 ; Lansdown v. Lansdown, 2 Bligh, P. C. 60 ; Strong v. Benedict, 5 Cowen, 210 ; Collins v. Masters, 2 Bailey, S. C. Law R. 145 ; Sumner v. Williams, 8 Mass. 214 ; Miller v. Heller, 7 Serg. & Rawle, 40 ; Foord v. Wilson, 8 Taunton, 543 ; Nivd. v. Marshall, 1 Brod. & Bingh. 319 ; Miller v. Horton, 1 McClelland, 647 ; Johnson v. Hoffman, 9 Law, 273 ; Hesse v. Albert, 3 Mann. & Ryl. 406 ; Davis v. Lyman, 6 Conn. 253 ; Allen v. Barish, 3 Hammond, 134 ; Hurd v. Cushing, 7 Pick. 171 ; Adams v. Cuddy, 13 Pick. 463 ; Ibid. 119 ; Knickerbocker v. Kilman, 9 Johns. 107.

Fifth Point. Taken together, the intent of the parties was clearly to purchase and convey the title of John J. Van Rensselaer, and nothing more, to Daniel Penfield, and only to covenant against all encumbrances except the leases and one mortgage, particularly mentioned in both instruments.

The points made by the counsel for the appellees were the following.

I. Under the will and codicil of John Van Rensselaer, there was an estate tail male in remainder in the premises in question, (viz. in the rents reserved in fee on the sale of the Claverack lands, and in the lands unsold,) in John Van Rensselaer, son of John J. Van Rensselaer, grandson of the testator, expectant upon the death of the said John J. Van Rensselaer, which vested when he, the said John Van Rensselaer, was born. 1 Inst. 19, 20 ; Doe v. Perryn, 3 T. R. 484 ; 2 Hill. Abr. 403 ; Carver v. Jackson, 4 Peters, 89, 90 ; Doe d. Barnes v. Provoost, 4 Johns. 61.

II. The estate tail, so vested in remainder in the said first-born son, was abolished by the statute of 1786, and turned into

a fee simple, which thereby destroyed all the ulterior remainders; because, —

1st. The object of the act was to abolish entails altogether, and thereby to abolish primogeniture, which was peculiarly protected by the statute *de donis.*

2d. If the abolition of entailments under said act should be confined to cases of actual corporeal possession of the estate tail in freehold, a large class of estates, rights, and interests would not be freed under it, but would be still subject to entailments, and to the law of primogeniture in its most rigid form; viz. all expectancies and incorporeal hereditaments.

3d. The abolition of entailments might be followed either with the return of the estate to the old qualified fee on which the estate tail was engrafted, or with the conversion of the estate into a fee simple. And the design of the act in stating that the party seized of the entail should become seized of the fee, was to explain the character of the abolition, viz. its conversion into a fee, and not to limit it so as to exclude expectancies and incorporeal hereditaments.

4th. The seizin designed in that clause of the act was such as is sufficient to cast the descent in the particular case.

5th. A vested remainder in tail, acquired by devise (which is a purchase), is descendible; the owner thereof having such a seizin as will make him the *stirps* or stock of descent. Ld. Raym. 728; Jacob, tit. *Purchase;* Cro. Eliz. 431; 1 T. R. 404, 634; 2 Bl. Com. 241; Ratcliffe's case, 3 Rep. 42.

6th. The seizin, to cast the descent even of a fee, need not be an actual corporeal possession of the freehold; and to cast a descent of an estate tail acquired by devise from the tenant as the stock of descent, it is sufficient that such tenant is *in esse* and the estate vested in him, even if it be an expectancy or an incorporeal hereditament. Doe *v.* Hutton, 3 Bos. & Pull. 648; Cruise, tit. 29, ch. 4, §§ 15, 16, 17; Co. Litt. 52 b; 3 Jac. Law. Dict. 92; Dyer, 141; 1 Rev. Statutes, 751, § 5; 1 Rev. Laws, 527, § 33; 2 Chit. Pl. 568, Springfield ed. 1833; 3 Chit. Pl. 1331; Com. Dig., *Pleader,* c. 35, 6; Jac. Law Dict., tit. *Seizin;* also tit. *Remainder and Reversion;* Throtsby *v.* Adams, Plowd. 191, 921; Wade *v.* Bache, 1 Saund. 149; Alton Wood's case, 1 Rep. 27 b; Theobald *v.* Tindal, 3 Went. Pl. 502, 503; Clare *v.* Brooke, 2 Plow. 443; Hearne's Pleader, 837; Modern Entries, 201; Leyman *v.* Abeel, 16 Johns. 31; Jackson *v.* Hendricks, 3 Johns. Cas. 214; Bates *v.* Schroeder, 13 Johns. 260; Jackson *v.* Hilton, 16 Johns. 96; Doe *v.* Provost, 4 Johns. 61; Burnet *v.* Denniston, 5 Johns. Ch. 35; 2 Johns. 288; Vanderheyden *v.* Crandall, 2 Denio, 9; Van Rensselaer *v.* Poucher, 5 Denio, 35, affirmed by the Court of Appeals, New York, MSS.

7th. A remainder in tail, which may be inherited or holden, is a tenement or hereditament, and is embraced within the language of the first section of the act of 1786. Cruise, tit. 2, ch. 1, § 8.

III. John J. Van Rensselaer, upon the death of the testator, became seized of a freehold estate for life in the premises in question, as well in the rents as in the lands not demised; and, upon the birth of his first-born son, had an expectancy in fee, as presumptive heir of his said first-born son.

IV. John J. Van Rensselaer, being seized of and entitled to the said premises, did on the 4th of March, 1794, in and by articles of agreement, for a full pecuniary consideration, covenant with Daniel Penfield to convey to him the said premises in fee simple, with the full and absolute enjoyment thereof, free from all encumbrances and charges, other than leases of himself and ancestors.

V. John J. Van Rensselaer, being so seized, did on the 31st of December, 1794, and the 1st of January, 1795, by lease and release, for a full pecuniary consideration, sell and convey the said lands to the said Daniel Penfield in fee simple, *habendum* to the said Daniel Penfield, his heirs and assigns for ever, as fully as he, the said John J. Van Rensselaer, then enjoyed, or theretofore had enjoyed the same; that is to say, whether the ownership embraced the land itself in possession or reversion, or an incorporeal right in the land, such as rent reserved.

VI. The first-born son of John J. Van Rensselaer having been at his birth vested with an estate in fee simple in expectancy in said rents and lands not leased in virtue of the devise and the act of 1786, upon his death without issue, said rents and lands descended from him in fee to his father. N. Y. Stat.

VII. John Watts, as the grantee of Daniel Penfield, with covenants for the title in fee, being at the time of the death of the first-born son seized in his demesne of a freehold life estate, under and by virtue of the aforesaid conveyance by lease and release from John J. Van Rensselaer, the estate in fee simple in the premises so descended to the said John J. Van Rensselaer enured to the benefit of the said John Watts, and by his will subsequently vested in his devisees. 2 Hill. Abr. 401; Sweet *v.* Green, 1 Paige, 473, 476; Stow *v* Wise, 7 Cow. 214; Astor's case, 4 Peters, 85.

VIII. John J. Van Rensselaer and his heirs at law, of whom the plaintiff is one, by his aforesaid conveyance to Daniel Penfield were and are estopped in law from claiming any right and interest in the premises.

1. The covenant in the deed of 1795 amounts to a stipulation and guaranty, that the grantee should quietly enjoy the

entire fee in the property conveyed, viz. in the land, where he owned the land itself, and in the incorporeal hereditaments, viz. the rents and reversions, where the lands had been leased.

2. The description in the *habendum* clause of said lease was not intended to qualify or affect the quantity of estate, but the subject-matter, and to confine and apply it as well to rents and reversionary interests, where there had been leases, as to lands not having been leased. 2 Hill. Abr. 350, and references.

3. The articles of agreement show a fee was intended, and not such an interest as he might chance to have. 2 Hill. Abr. 341; 2 Atk. 545; 6 Har. & Johns. 460; Jones *v.* Gardner, 10 Johns. 266.

4. The covenants in said deed, so construed, not only harmonize with the said description in the *habendum* clause, as above explained, but also with the intent manifested in the said articles of agreement, and are thus rendered operative. 2 Bl. 107, 108; Jones *v.* Gardner, 10 Johns. 266.

5. The covenant in the deed, being in fee between the parties and their heirs, that the land is free from encumbrances, except leases, &c., specified, is broken, if there be any other outstanding encumbrances; and an estate in expectancy oustanding is an encumbrance upon the land and the seizin thereof. Prescot *v.* Freeman, 4 Mass. 627; 14 Viner's Abr. 352, tit. *Encumbrance*, A.; Sugden, 527, § 9, II.; Jackson *v.* Parker, 9 Cow. 86; Lovell *v.* Luttrel, Savile, 74.

6. The said John J. Van Rensselaer, by the whole context of the said deed and the said articles of agreement taken *in pari materia*, held himself out to the purchaser as a fee simple owner, and having at the time an expectancy in fee as presumptive heir, is estopped from claiming the title which afterwards descends upon him as such heir. Mason *v.* Muncaster, 9 Wheat. 445; Jackson *v.* Bull, 1 Johns. Cas. 81; Jackson *v.* Murray, 12 Johns. 201; Fisher *v.* Newland, 21 Wend. 94; Jackson *v.* Stevens, 13 Johns. 319; Noel *v.* Barclay, 3 Simons; Fairbanks *v.* Williamson, 7 Greenleaf, 97; Helps *v.* Hereford, 2 Barn. & Ald. 242; Rees *v.* Lloyd, Wightw. 123; McWilliams *v.* Nasby, 2 Serg. & Rawle, 512; Goodtitle *v.* Morse, 3 T. R. 365; Carver *v.* Jackson, 4 Pet. 89, 90; Bensly *v.* Burdon, 2 Sim. & Stu. 519; 1 Rev. Laws N. Y., p. 74, § 5; 1 Greenleaf's Ev. §§ 22, 24, 207, 210; 8 Wend. 483; 4 Wend. 619; 1 Rev. Stat. N. Y. p. 739, §§ 143, 145.

IX. Assuming that John J. Van Rensselaer, the grandson, took an estate tail under the will, the same was, by the rule in Shelly's case, at once, upon the death of the testator, turned into a fee by the act of 1786, and the fee passed directly by his deed to Penfield.

X. Where there is any doubt or difficulty, the construction

should be favorable to the grantee. Jackson *v.* Gardner, 8 Johns. 391.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the Southern District of New York.

John Van Rensselaer, being seized in fee of a large tract of land in the county of Columbia, State of New York, made and published his last will and testament on the 25th of May, 1782, by which he devised the same to John J. Van Rensselaer, his grandson, for and during his natural life; and from and after his decease, to the first son of the body of the said John J. lawfully begotten, and to the heirs male of his body; and, in default of such issue, then to the second, third, and every other son of the said John J., successively, and, in remainder, the one after the other, as they shall be in seniority of birth, and the several and respective heirs male of the first, second, third, and other son or sons; the eldest of such sons, and the heirs male of his body, being always preferred.

The testator died in 1783, leaving John J., the grandson, surviving, who entered into the possession and enjoyment of the estate. John J. had five children, John, the first-born, whose birth was in 1791, Jeremiah, the present complainant, Cornelius, and Glen, and a daughter, Catherine G.

By an act of the legislature of the State of New York, passed 23d February, 1786, it was enacted as follows: "That all estates tail shall be, and hereby are, abolished; and that, in all cases where any person or persons now is, or, if the act hereinafter mentioned and repealed [referring to an act passed 12th July, 1782] had not been passed, would now be, seized in fee tail of any lands, tenements, or hereditaments, such person and persons shall be deemed to be seized of the same in fee simple absolute; and further, that, in all cases where any person or persons would, if the said act and this present act had not been passed, at any time hereafter become seized in fee tail of any lands, tenements, or hereditaments, by virtue of any devise, gift, grant, or other conveyance heretofore made, or hereafter to be made, or by any other means whatsoever, such person or persons, instead of becoming seized thereof in fee tail, shall be deemed and adjudged to become seized thereof in fee simple absolute." 3 Rev. Stat. N. Y., 1st ed., App. 48; 1 Rev. Laws, 1813, p. 52.

As we have already stated, John, the first-born son of John J., the grandson, was born in 1791, and he died without issue in 1813, while the life estate was running, his father having survived until 1828.

27 *

On the birth of John, the first-born, his remainder as the first tenant in fee tail, which was before contingent, became vested in interest, and he was thereafter seized of an estate tail in remainder, the vesting in possession being dependent upon the termination of the life estate.

The interest in the estate in remainder in which they vested immediately on his birth carried with it a fixed right of future enjoyment in possession, the instant the life estate terminated.

The question upon this branch of the case is, whether or not the estate in fee tail in remainder thus acquired under the will of John Van Rensselaer was converted into a fee simple absolute in John, the first-born son of John J., by the operation of the act of 1786, abolishing entails.

The act provides, that if any person shall thereafter "become seized in fee tail of any lands, tenements, or hereditaments, by virtue of any devise," &c., he shall be deemed to have become seized in fee simple absolute.

It is admitted that John, the first-born, took a vested remainder in fee tail under the will, the instant he came into being, and that he was seized of an estate in remainder in the premises in question; but it is insisted that this is not the character of the estate described in the statute, and which is there turned into a fee simple; that, in order to bring the case within it, the tenant in tail in remainder must be vested in possession, as well as in interest, and without which he cannot be said to be seized of the lands, tenements, or hereditaments; and, as John died during the running of the life estate, and therefore was never seized in possession, the fee simple did not vest in him under the statute; but was postponed to the next tenant in tail, the second son, Jeremiah, who is the complainant in the suit.

We do not propose to enter into an examination of this question, and which involves the true construction of the act of 1786; as that act has been several times before the courts of New York, and its construction settled by the highest authority in that State. (Vanderheyden *v.* Crandall, 2 Denio, 9; S. C. on appeal, 1 Comstock, 491; Van Rensselaer *v.* Poucher, 5 Denio, 35.)

One of the cases arose under the will before us, and involved the question as to the effect of the act upon the estate of John, the first-born tenant in tail, the same as here.

The construction of the act as given in these cases must form the rule of decision upon the question, according to the established course of proceeding in this court. (12 Wheat. 167, 168; 6 Peters, 291; 7 How. 818; 8 How. 558, 559.)

In the case in the Court of Appeals in New York, Mr. Justice Bronson, who delivered the judgment of the court, observed

that "it is true the statute speaks of a person seized of lands, tenements, or hereditaments; and, in general, seizure of lands, means actual possession of them. But, taken in their connection, the words evidently mean seizin of an estate in lands. The legislature began by speaking of estates tail; that was the subject in hand; those estates were to be turned into estates of a different tenure or quality; and the law-makers must be understood as speaking of the same thing in the latter part of the clause which they had mentioned in the first."

He observes, "As I read the statute, the provision is, that all estates tail shall be abolished; and where any person now is seized of an estate in fee tail on any lands, &c., such person shall be deemed to be seized of the same (to wit, an estate in the lands) in fee simple."

He further remarks, "The third section, which regulates descents, like the first, which abolishes entails, speaks of a person seized of lands, tenements, or hereditaments; and I think the word 'seizin' was used in the same sense in both sections. One who has a vested remainder in fee simple expectant on the determination of a present freehold estate has such a seizin in law, when the estate was acquired by purchase, as will constitute him a *stirps* or stock of descent under the third section. And the person who has a vested remainder in fee tail, acquired in the same way, has such a seizin in law as brings his case within the operation of the first section. His remainder in fee tail is turned into a remainder in fee simple. The first section brings the case under the influence of the third. And the estate no longer follows the will of the donor, but is governed by the general law of descents."

This being regarded as the true construction of the act of 1786, it follows that John, the first-born son of John J., took an estate in fee simple absolute in remainder in the premises; and that on his death, in 1813, it descended, according to the law of New York, to his father, the life tenant; and the two estates being thus united in him, he became vested with the whole estate in fee simple absolute.

The complainant, therefore, has failed to make out any estate in the premises under the will of John Van Rensselaer. And can claim title only through his father, John J., as one of the heirs of his estate.

The tract of land in question embraces between thirty-three and thirty-four thousand acres, and on the 1st of January, 1795, John J., the life tenant, sold and conveyed the same in fee to Daniel Penfield, for the consideration of $44,550.

It is more than probable it was the opinion of the profession in New York, at the date of this conveyance, that John J., the

grandson, took an estate in fee tail under the will of his grand-father, within the rule in Shelley's case, which the act of 1786 had turned into a fee simple absolute ; and that the purchase was made under the belief that he was competent to convey the fee.

It is admitted, however, that this construction, which may have been given at the time, was a mistaken one ; and that he took only an estate for life, which terminated on his death, the 26th of September, 1828.   At that time, we have seen, he was seized of the whole estate in fee in consequence of the death of his eldest son, the first-born tenant in fee tail in 1813, and which descended to his four children, three sons and a daughter, as tenants in common, of whom the complainant is one, unless they are estopped from setting up the title by the deed of the 1st of January, 1795, to Penfield, under whom the defendants hold.

On the part of the complainant, it is insisted that the conveyance is a deed of bargain and sale, and quitclaim, without any covenants of title or warranty, and therefore could operate to pass only the estate for life of which the grantor was then seized; that it contains no appropriate words, when taken together, by force of which the subsequently acquired title enured to the benefit of the grantee, or those claiming under him, or that can estop the heirs from denying that he had any greater estate than the tenancy for life ; and that the deed purports on its face to grant and convey simply the right, title, and interest which the grantor possessed in the premises at the time, and nothing more; that the only covenant is a covenant against encumbrances, which affords indemnity against any liens or charges upon the estate conveyed, but which cannot be regarded as warranting the title ; and that this express covenant takes away all implied ones.

This is the substance of the argument on the part of the appellant.

By the covenant against encumbrances, the grantor, for himself and his heirs, covenants and agrees to and with the grantee and his heirs and assignees, that the tract of land conveyed, excepting parts previously sold in fee by his ancestor, John Van Rensselaer, and by himself; also, lands leased to Robert Van Rensselaer, a lot of woodland to be conveyed by the grantee to H. J. Van Rensselaer, a tract lying in the city of Hudson, and a farm in the possession of Mrs. Moore,—with the exception of these several parcels, the grantor covenants that the tract conveyed is free and clear, and shall be held and enjoyed by the grantee, his heirs and assigns, according to the true intent and meaning of these presents, freely and clearly

acquitted and discharged of and from all encumbrances and charges other than leases heretofore given by the said grantor and his ancestors.

This covenant, it will be seen, excepts out of the indemnity, in express terms, parcels of land previously granted out of the tract, in fee simple, and the title to which was outstanding in third persons; and also the leases which had been given in fee, or for the lives of the lessees, on which rents had been reserved, and which leases were to be transferred to the grantee as rents and profits belonging to the estate, and which he was to enjoy.

The draughtsman seems to have supposed that the outstanding titles in fee in these several tracts, and also the leases in fee and for lives previously granted, and above referred to, would have been embraced within the covenant, unless expressly excepted out of it, and that they might be regarded as an encumbrance upon the estate which the deed purported to convey, and consequently a breach of this covenant against encumbrances. This is the natural, if not the necessary, implication from the structure of the covenant; for, otherwise, the exceptions are without meaning.

And, by parity of reasoning, the implication is equally strong, that the covenant embraced, and was intended to embrace, and secure to the grantee and his heirs, the whole of the interest and estate in the tract which the deed purports to convey, saving and excepting only the parcels and portions of the title thus enumerated and taken out of it; and hence, if any outstanding title existed not enumerated and excepted, there would be grounds for alleging a breach of the covenant, and for claiming that the grantee, his heirs or assigns, were entitled to an action to recover indemnity for such diminution of the estate.

This result would seem almost necessarily to follow from the nature and structure of the covenant, unless we regard it as inserted mainly for the benefit of the grantor, to enable him to make the exceptions. For it is but reasonable to presume that the draughtsman, in making the exceptions, did not stop short in the enumeration of the parts and portions of the estate and title intended to be saved from its operation; or that he omitted any right or interest not intended to pass by the conveyance. And hence the reasonableness of the implication, that every part of the estate and interest in the same that the deed purported to convey was intended to be embraced within the covenant not included within the exception.

These several rights and interests had already been excepted out of the granting clause in the deed, and hence the excep-

tion in this part of the instrument was not necessary for this purpose. The exception here related exclusively to the covenant of enjoyment of the premises free from all encumbrances; and was intended as a saving from its scope and obligation.

There is much force, therefore, in the argument, that this covenant, from its peculiar phraseology and structure, was intended as something more than a simple covenant against encumbrances and charges upon the estate; and that it was intended by the parties as a covenant of the title which the deed purported to convey, and if so, this of itself would operate upon the estate subsequently acquired by the grantor, so that it would, as against him and all persons claiming under him, enure to the benefit of the grantee, his heirs and assigns.

But independently of this view, and of any covenants of title, in the technical sense of the term, in the deed of 1st January, 1795, we are of opinion that the complainant is estopped from denying that John J. Van Rensselaer, the grantor, was seized of an estate in fee simple at the date of that deed, the grounds of which opinion we will now proceed to state.

The general principle is admitted, that a grantor, conveying by deed of bargain and sale, by way of release or quitclaim of all his right and title to a tract of land, if made in good faith, and without any fraudulent representations, is not responsible for the goodness of the title beyond the covenants in his deed. (7 How. 159; 2 Sugden on Vendors, ch. 12, § 2, p. 421; 2 Kent's Comm. 473; 4 Ib. 471, note; 1 Cow. 616; 9 Cow. 1; 4 Wend. 622; 7 Conn. 256; 11 Wend. 110; S. C. 13 Wend. 78; 12 Pick. 78; 1 Rev. Stat. N. Y. 739, §§ 143, 145; 15 Pick. 23; 14 Johns. 193.)

A deed of this character purports to convey, and is understood to convey, nothing more than the interest or estate of which the grantor is seized or possessed at the time; and does not operate to pass or bind an interest not then in existence. The bargain between the parties proceeds upon this view; and the consideration is regulated in conformity with it. If otherwise, and the vendee has contracted for a particular estate, or for an estate in fee, he must take the precaution to secure himself by the proper covenants of title.

But this principle is applicable to a deed of bargain and sale by release or quitclaim, in the strict and proper sense of that species of conveyance. And therefore, if the deed bears on its face evidence that the grantors intended to convey, and the grantee expected to become invested with, an estate of a particular description or quality, and that the bargain had proceeded upon that footing between the parties, then, although it may not contain any covenants of title in the technical sense of the

term, still the legal operation and effect of the instrument will be as binding upon the grantor and those claiming under him, in respect to the estate thus described, as if a formal covenant to that effect had been inserted ; at least, so far as to estop them from ever afterwards denying that he was seized of the particular estate at the time of the conveyance.

The authorities are very full on this subject. Goodtitle *v.* Bailey, Cowp. 601 ; Bensley *v.* Burdon, 2 Sim. & Stu. 524 ; S. C., 5 Russell, 330 ; 2 Barn. & Ad. 278, where this case is referred to ; Doe ex dem. Marchant *v.* Ewington, 8 Scott, 210 ; Rees *v.* Lloyd, Wightwick, 129 ; Bowman *v.* Taylor, 2 Ad. & Ellis, 278 ; Lainson *v.* Tremere, 1 Ib. 792 ; Stone *v.* Wise, 7 Conn. 214 ; Penrose *v.* Griffith, 5 Binney, 231 ; Denn *v.* Cornell, 3 Johns. Cas. 174 ; 8 Cow. 586 ; Carver *v.* Jackson ex dem. Astor, 4 Peters, 1 ; 7 Greenl. 96 ; 4 Kent's Com. 271, note ; 1 Smith's Leading Cases, p. 450, note to the Duchess of Kingston's case.

In the case of Bensley *v.* Burdon, the party granting the estate recited that he was entitled to a remainder in fee, expectant upon the determination of the life estate of his father, in certain premises therein described. In point of fact, he had no interest in the premises at the time ; but became vested with an estate for life in a part of them some two years afterwards, under the will of his father, and soon after conveyed this interest to the defendant.

The Vice-Chancellor held, that the grantor having averred in the deed that he was seized of a remainder in fee, expectant on the death of his father, he was estopped from setting up, that, at the time of the grant, he was not duly seized of the estate according to the averment; that the estoppel run with the land, and bound not only the grantor, but all claiming under him ; and that the defendant was, therefore, equally estopped from denying the title.

There was an appeal in this case to the Lord Chancellor, and his decision is referred to as reported in 5 Russell, 330 ; but there is an error in the reference, and I have not been able to find it.

But in Right ex dem. Jefferys *v.* Bucknell (2 Barn. & Ad. 281), Lord Tenterden refers to the case, and says that the judgment of the Vice-Chancellor was affirmed, and that the Chancellor put his decision on the ground, that the recital of the interest of the grantor in the premises was an averment of a particular fact, by which the defendant was concluded.

And in the case of Doe ex dem. Marchant *v.* Ewington, which was an action of ejectment to recover possession of a set of chambers in Lincoln's Inn, it appeared that one Boileau, having been admitted by the Benchers of the society, the owners

of the fee, to the chambers for life, had granted the same to the lessor of the plaintiff in trust to secure an annuity, reciting in the deed that he was well entitled to an estate for life in the chambers.

Afterwards Boileau, by an arrangement with the defendant, surrendered to him the possession of the chambers, who continued to occupy them at the time of the commencement of the suit, which was brought in consequence of the annuity being in arrear.

By the regulations of the society, it appeared that, in order to surrender possession, the person last admitted must present a petition to the Masters of the Bench for permission to surrender, first paying all his arrear of dues; and the person who is to succeed must also present a petition to be admitted; and thereupon, if consent be given, then an order is entered that the person admitted may have leave to surrender, and the person who is to succeed may be admitted on paying the fine and fees. And that it is in the discretion of the masters, for the time being, to make such orders for the admission to or exclusion from chambers in the Inn as they may think fit.

The lessor of the plaintiff sought to recover on the ground that Boileau was estopped from denying that he was seized of an estate for life in the chambers by the recital in his conveyance; and that the defendant coming in under him was equally estopped.

Tindall, C. J., in giving judgment, observed, that the case had very properly been argued on the ground of estoppel; for if it were a question of title, the lessor of the plaintiff would clearly be out of court. That he must claim under the estoppel created by the recital in the deed of conveyance. He admitted that Boileau was bound by the recital; and the defendant also, if in privity of estate; that, according to the old authorities, he must either come in the per or the post, that is, he must claim from, through, or under the party. That the defendant did not claim under Boileau, but under the trustees of the society of Lincoln's Inn, and therefore was not estopped from denying the title.

Coltman, J. observed, that, as between Boileau and the lessor of the plaintiff, the former might be estopped from denying that he had the estate he represented by his deed; but that, to enable the plaintiff to succeed, it was necessary for him to show that the defendant claimed through or under Boileau, so that the estoppel should affect him.

In the case of Bowman *v.* Taylor, Lord Denman, C. J. observed, that, " as to the doctrine laid down in Co. Litt. 352 b, that a recital doth not conclude, because it is no direct affirma-

tion, the authority of Lord Coke is a very great one; but still, if a party has by his deed recited a specific fact, though introduced by a 'whereas,' it seems to me impossible to say that he shall not be bound by his own assertion so made under seal."

And Taunton, J. remarked, in the same case, that the law of estoppel is not so unjust or absurd as it has been too much the custom to represent. ' The principle is, that, where a man has entered into a solemn engagement by deed under his hand and seal as to certain facts, he shall not be permitted to deny any matter which he has so asserted.

In the case of Fairbanks *v.* Williamson, there was no covenant of title in the deed, which was in fee; but the grantor covenanted that neither himself, his heirs, or assigns would ever make any claim to the premises. The court held that this operated as an estoppel, not only upon him, but upon all claiming under him, from setting up an after-acquired title to the land against the grantee or those in privity with him.

In Jackson ex dem. Munroe *v.* Parkhurst et al. (9 Wend. 209), the recovery was placed altogether on the ground of estoppel, the defendant holding under the grantor of the deed in which the title was recited. And in Right ex dem. Jefferys *v.* Bucknell, where the recital in the deed was, that the grantor was *legally* or *equitably* entitled to an estate in fee in the premises, the court refused to bind the party coming in under him as a purchaser for a valuable consideration of the after-acquired title, solely on the ground that there was no certain and precise estate set forth in the recital.

The principle deducible from these authorities seems to be, that, whatever may be the form or nature of the conveyance used to pass real property, if the grantor sets forth on the face of the instrument, by way of recital or averment, that he is seized or possessed of a particular estate in the premises, and which estate the deed purports to convey; or, what is the same thing, if the seizin or possession of a particular estate is affirmed in the deed, either in express terms or by necessary implication, the grantor and all persons in privity with him shall be estopped from ever afterwards denying that he was so seized and possessed at the time he made the conveyance. The estoppel works upon the estate, and binds an after-acquired title as between parties and privies.

The reason is, that the estate thus affirmed to be in the party at the time of the conveyance must necessarily have influenced the grantee in making the purchase, and hence the grantor and those in privity with him, in good faith and fair

dealing, should be for ever thereafter precluded from gainsaying it.

The doctrine is founded, when properly applied, upon the highest principles of morality, and recommends itself to the common sense and justice of every one. And although it debars the truth in the particular case, and therefore is not unfrequently characterized as odious, and not to be favored, still it should be remembered that it debars it only in the case where its utterance would convict the party of a previous falsehood; would be the denial of a previous affirmation upon the faith of which persons had dealt, and pledged their credit or expended their money.

It is a doctrine, therefore, when properly understood and applied, that concludes the truth in order to prevent fraud and falsehood, and imposes silence on a party only when in conscience and honesty he should not be allowed to speak.

Now, applying this doctrine to the case in hand, our next inquiry will be, whether or not John J. Van Rensselaer affirmed, in his deed of January 1, 1795, to Penfield, that he was seized of an estate in fee in the premises, and whether the deed purports on its face to convey an estate of that description.

As to the question involved in the latter branch of the inquiry, we need only refer to the words of the grant to determine it. The deed is of all the right, title, and interest of the grantor in the tract of land to Penfield, his heirs and assigns for ever, terms that would have passed an estate in fee, if John J. had been seized of it at the time of the conveyance.

The most important question arises upon the other branch of the inquiry. Has the grantor affirmed on the face of the deed that he was seized of this particular estate in the premises at the time he made the grant?

The argument on the part of the complainant is, that, although the granting words of the deed are broad and comprehensive, — such as, " have granted, bargained, sold, aliened, enfeoffed, assured, released, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, assure, release, and confirm unto the said Daniel Penfield," "and to his heirs and assigns for ever, all and singular the aforesaid tract of land," &c., " and also all leases of and concerning any part or parts of the said granted premises; and also all the estate, right, title, interest, property, possession, claim, and demand of them, the said John J. Van Rensselaer and Catherine, his wife, in the same," — yet the grant is qualified by the *habendum* clause, — " to have and to hold the said tract of land so described, and so butted and bounded as above recited, &c., unto the said Daniel Penfield, his heirs and assigns, to the only proper

use and behoof of the said Daniel Penfield, his heirs and assigns for ever, in as full and ample a manner as the said John J. Van Rensselaer now hath and enjoyeth the same, and in as full and ample a manner as the same hath heretofore been had and enjoyed by the said John J. Van Rensselaer, or lawfully might, if these presents were not made, be had, used, occupied, or enjoyed by him, his heirs or assigns."

This latter clause, it is supposed, restricts and qualifies the general words in the grant, and confines the effect and operation of the deed to the conveyance of such an estate as the grantor was seized and possessed of at the time; and, as this was an estate for life with remainder over, it operated, and was intended to operate, to convey only this estate.

Were there nothing else in the case, there might be much difficulty in furnishing a satisfactory answer to this view, although no one, we think, can read the deed without being strongly impressed with the conviction, that both parties supposed they were dealing with the fee, and that the bargain was made upon that understanding.

But, in order fully to comprehend and interpret this qualifying clause in the *habendum,* it is material to look into the nature and condition of the title at the time, and the mode of enjoying the estate, and also into the evidences of the title which were turned over to the purchaser at the execution of the contract, all of which appear in the deed and articles of agreement therein recited and referred to.

As we have already said, in another branch of the case, a part of the tract had been previously conveyed in fee, and amongst others by the grantor himself, and which is excepted from the grant. Much the larger part was at the time in the occupation of tenants under leases in fee, or for the lives of the lessees, with rents reserved, made, amongst others, also by John J., which leases were transferred to Penfield as muniments of the title. The articles of agreement provided for the transfer of these leases, and the deed itself in terms embraces them in the granting clause.

In the articles of agreement, also, Penfield is required to covenant that he will execute leases, according to the terms and conditions upon which they had been usually granted, of certain portions of the tract to several persons therein named; and which leases, as we have seen, according to the custom of granting, were to be made in fee, or for the lives of the lessees. The deed also contains the recital of a mortgage in fee upon the estate, given by John J., the 11th August, 1791, to Schuyler, for securing the payment of $ 7,750, which Penfield was to discharge out of the purchase-money.

Now all these instruments affecting the title, and showing the tenure and conditions by and under which the estate was held and enjoyed, are particularly referred to in the articles, and in the deed of conveyance, and are thus virtually incorporated into the same; and were so for the purpose of describing with greater precision the nature and condition of the title, and of the rights and interests of the grantor in the tract conveyed. And looking at them, and at the right and title therein asserted and affirmed, and upon the faith of which the purchase was made and the deed taken, we shall be enabled to comprehend and give proper application to the words in the *habendum;* namely, that the grantee, his heirs and assigns, shall hold in as full and ample a manner as the same is possessed, occupied, and enjoyed by the grantor, or as might be possessed and enjoyed by him, his heirs and assigns, if these presents had not been made.

Admit that the clause refers to the title and estate possessed by the grantor, as well as to the premises described, what title and estate? Manifestly that which is evidenced by the muniments of title before referred to, and particularly identified and described in the granting clause of the deed, a title evidenced by leases in fee with rent reserved, made by John J. and his ancestors, and which passed to the grantee as securing the rents and profits issuing out of and belonging to the estate conveyed.

These leases characterize the title to the tract sold, and afford evidence that cannot be mistaken of the estate intended to be conveyed, and it was the enjoyment of this estate and interest in the premises, in the manner and way in which the grantor had used, occupied, and enjoyed the same, to which the *habendum* clause refers. This affords a full explanation of its object and meaning.

The reference to these leases, and virtual incorporation of them into the deed, and transfer as muniments of the title, especially those made by John J. himself, together with the mortgage in fee to Schuyler which was to be raised out of the purchase-money, and the covenants required of Penfield to grant similar leases to certain persons named, all clearly import, on the face of the instrument, an assertion, or affirmation on the part of the grantor, that he was seized of a title that enabled him to make the leases and mortgage, and that would also enable Penfield to grant similar leases, namely, leases in fee; and which brings the case directly within the principle of law already stated, that estops him, and those coming in under him, from denying that he was so seized.

The estoppel works upon the estate, and passes with it, and

binds the title subsequently acquired by the death of his eldest son, the first-born tenant in tail.

We are satisfied, therefore, after the fullest consideration of the case, that the decree of the court below is right, and should be affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New-York, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.