Mr. Justice James
delivered the opinion of the Court:
This is an action of ejectment for the recovery of a parcel of land alleged to contain 6x3/<r acres more or less, part of an estate formerly owned by General'Hiram Walbridge, deceased, and known as “ Ingleside.” After issue joined a stipulation of counsel was filed, to the effect that both plaintiff and defendant claimed the premises under the title acquired by the said Walbridge; and that his last will and testament, dated December 5, 1870, and recorded in the office of the register of wills in this District, should be admitted in evidence without proof. Afterwards Hem an D. Walbridge and Reginald Fendall, surviving trustees under the last will and testament of Helen B. Corkhill, deceased, ■were admitted as parties to defend instead of the defendant, Hammack, who was served as tenant.
Verdict was for the defendants. Motion for a new trial was overruled, and the case now comes here on a case stated and bills of exception.
The main issue turns on the meaning of certain descriptions in the will above referred to of the properties devised, respectively, to the wife and to the brother of the testator. The will was in the following words:
“In the name of Cod, amen, I, Hiram Walbridge, of sound mind — disposing body, do ordain and constitute this my last will and testament, as follows: First, to pay my just and lawful debts; second, to give to my wife my estate known as, Ingleside, consisting of Ingleside and all of the personal property thereon, consisting of sixty-five acres, near the city of Washington, for her as her personal property forever, her heirs and assigns, and the furthe,r sum of one hun *157 dred and ten thousand dollars,to be paid to her as follows: Five thousand dollars thirty days from the day of my decease,, fifty thousand dollars one year from the day of my death ; five thousand dollars — eighteen months of my decease, and the remaining fifty thousand dollars two years from the day of my death; to be paid to her by my executors. Second, my farm near the city of Washington, consisting of one hundred acres, shall be given and bequeathed forever to my brother, Hem an D. Walbridge, as his sole gjid exclusive — forever to him, for his use and property forever. Thirdly, my remaining property to my brothers, Hernán D. Walbridge and Horace S. Walbridge, to their sole use and property forever; charging them with carrying out the first propositions of this will and testament. To this will and testament I hereby subscribe. I charge Horace S. Walbridge and Hernán D. Walbridge as my executors to this instrument, in the presence of Amos Dodge, of New York, Charles B. Blake, and Doctor James Phillips, of the same place; Amos Dodge, Doctor James Phillips, and Charles B. Blake, subscribing witnesses to the same.
“Dated in New York, December 5, 1870.
“Hiram Walbridge:”
The first question to be considered is, whether the land in dispute was devised by this will to Mrs. Walbridge as part of “Ingleside,” or to the plaintiff as part of the “farm;” in other words, in what sense the testator used these designations. His acts and conversations were admitted for the purpose of determining that question. The plaintiff, for example, produced an earlier will and a deed of .trust, in both of which provision had been made by the testator for his wife, as tending to show what dividing line between Ingleside and the farm must have been iii his mind when he made his last will. In order to make an intelligent use of these documents we must first, however, consider certain conveyances to which they refer, and which were also *158 produced by the plaintiff. For the same reason a preliminary statement should here be made.
The property near Washington, mentioned in the will, was purchased by the testator in several parcels. Two of these originally constituted the Hewlings estate, though they were at the same time divided by a certain county road. This Hewlings -property, while thus divided, had been known as “ Ingleside.” These facts sufficiently explain the deeds to which we shall refer.
By a deed dated May 12,1855, Edward Hewlings, Thomas B. A. Hewlings, and Mary L., his wife, conveyed of these parcels to Samuel T. G. Morsell, describing it as “being a part of a certain tract of land called ‘Ingleside/ and being all of the said tract which lies south of a certain county road,” &c. By a deed of the same date Morsell and wife conveyed the same parcel to the testator, describing it in the same words. Two days later, by a deed dated May 14, 1855, Thomas B. A. Hewlings, as trustee for his wife, Mary L., who joined by way of request, conveyed to the testator a parcel lying on the north side of the same road, describing it as “ being a part of a certain tract called ‘ Ingleside/ * * * and being the portion of said .tract upon which has been erected the Mansion House on said tract,” &c. Finally the testator purchased from William Stone and others a third parcel adjoining to and north of the Hewlings property, by a deed dated April 26, 1861, which described the premises as “ being those parts of the tracts called ‘ Pleasant Plains’ and ‘Slippery Hills/ contained within the following bounds,” &c.
It was to these sources of his title that the testator referred in the following provisions of his proposed will of August 22, 1864:
“ 2d. In lieu of the right of dower I hereby give to my esteemed and beloved wife, as a tribute for her devotion and affection to me — I give and bequeath the mansion ‘Ingleside/ and the sixty acres of land which surrounds it north *159 of the road which leads to Mr. Pierce’s farm, the land here intended being that purchased by me of Mr. I B. -A. Hemilings and the additional twenty' (20) acres purchased of the cowrt through Mr. Stone, the lawyer; all the personal property in the mansion and all the horses, carriages, &c., belonging to me and in use there are also to go with the real estate above described. _ I further give and bequeath to my said wife the sum of ten thousand dollars, to be paid by my executors at the rate of two thousand dollars per annum, without interest, commencing on the 1st of January succeeding my death and payable in five installments of two thousand dollars each. I further give to my said-wife the indebtedness due me of two thousand dollars and its interest due me from advances made her son-in-law, Alfred H. Jackson, and request the notes given me by said Jackson to be given to her, and also the furniture, to the value of some two hundred dollars, which I have advanced for her son Chas. B. Blake. I further give her one thousand dollars, to be given her within thirty days after my decease.
“ 3d. To my esteemed and good mother I give my farm south of the road leading to Mr. Pierce’s, this farm bei/ng the land purchased by me of Mr. Sam’l T. G. Morsell, and consists of nearly one hundred acres.”
The first question is whether the deeds referred to in this paper had of themselves the effect to define the meaning of Ingleside and farm. The plaintiff’s printed argument asserts their independent effect in the following language: “Thus it is seen that the deeds themselves both appeal to the old county road; that of the 14th of May calling for said old road, as forming the south boundary■ of the Ingleside tract, and the one of May 12 calling for the old road, as the north boundary of the farm. At this time, therefore, the ‘mansion tract’ was completely distinguished from ‘the farm’by the deeds themselves, and ‘the farm’was given its separate individuality, name and boundary, as distinguished from the mansion or ‘Ingleside’ tract, named as *160 such in the devise to Jane M. Walbridge, and each was 'bounded on the old road.”
This statement assumes that those instruments contained expressions which are not found there. Neither of them mentions or indicates the existence of a “ farm; ” and “ Ingleside ” is not applied in either as the special name of either tract. On the contrary, both tracts are described as being equally parts of Ingleside; the county road between them being further described as a road which divided the tract known as “ Ingleside.” Nor is the Mansion House mentioned in the deed of May 14 in a way that imports that the tract north of the county road was its peculiar appurtenance, or was therefore to be understood to be especially Ingleside. The language of the deed is, that the .parcel north of the road was “ that portion of said tract,” namely, that portion of Ingleside, “upon which had been erected the Mansion House on said tract; ” that is to say, the Mansion House on whatever was Ingleside. This deed distinctly imports that the house erected on one of the parcels had been the Mansion House of the whole estate,' and that each parcel had originally borne the same relation to it. Nothing in this paper indicates that the original name of both parcels had become restricted to one of them, when they were thus‘reunited in the hands of one owner, by what seems to have been one transaction, looking to the establishment of a single estate under one name.
It is in the proposed will of 1864, then, that we first find any parcel designated by a distinguishing name. The testator there devised to his mother his “farm,” referring-for more particular description to Morsell’s deed; and it is only in this way that these deeds have anything to do with the sense in which the testator used this designation in his last will. By this reference it is ascertained that the word “farm,” as used in the proposed will of 1864, described the whole of the parcel lying south of the old county road, and, therefore, included the land in dispute. But its effect in *161 'explaining names stops just there. It does not follow that General Walbridge, when speaking of part of his land as his “farm,” did not regard it as part of Ingleside, or that he applied that name distinctly to the rest of his land. In that particular paper he did not use “ Ingleside ” as the designation of land at all, and it is only from subsequent facts that we can learn how he applied it then or came afterwards to apply it. In view of the fact that the testator acquired both parcels as parts of “Ingleside,” we do not perceive any ground for holding that he used that name in a new sense or with a new application until he used it as a descriptive name. We have to await his own application of it. With this in view, we proceed to examine the rest of the documentary evidence. The plaintiff produced next a paper which was executed by the testator on January 8,1867, but was not delivered.
It purported to convey to his brother, in trust for the grantor’s wife during her life the following-described lands: “All that 'part or portion of a certain tract of land called ‘Ingleside,’ and bounded on the northward by the Piney Branch, on the eastward by the land of William Selden, and on the south and southwest by a county road which divides the said tract, and being that portion of said tract upon which has been erected the Mansion House on said tract, it being the same property which was conveyed or intended to be conveyed by Thomas ,B. A. Hewlings to said Hiram Walbridge by deed bearing date on'the 14th day of May, 1855,” &c., “ also all that part of Pleasant Plains and Slippery Hills contained within the bounds, &c., following,” &c. These were precisely the same lands which the testator had proposed, by the will of 1864, to devise to his wife in fee.
It was urged at the argument that this latter paper had the effect to show that the testator gave the name of “Ingleside” to the lands north of the old county road, notwithstanding this construction would apply it to the Stone tract, to which it- had never been applied before. We have *162 already said that that paper could not be so construed. It now appears further by the proposed trust of 1867 that the testator could not yet have assigned a new meaning to that name. After the lapse of nearly two and a half years, he still described one portion of the land north of the county road as part of Pleasant Plains and Slippery Hills, and the other as part of a tract called Ingleside. This does not show the adoption of Ingleside as the special name of the whole north tract. Indeed this paper makes no figure in explaining the sense in which the testator was in the habit of using that n&me.
But just here it is worth while to observe what effect it did have. It simply shows what provision General Walbridge intended in 1867 to make for his wife, and that fact is immaterial. It is important, however, to keep this very point in mind, inasmuch as the argument for plaintiff has seemed to us to rely to some extent on prior intention. It appears to assume, not in direct terms but in effect, that the testator’s intention, as to the extent of the provision for his wife, was the same in his last will as in the will of 1864, and then to claim that the boundary named in the earlier' paper shows, by re-action, the boundary of the same land described as Ingleside in the last will. Of course that conclusion is of no value without proof that the testator did speak of the same land, and that his intention was actually the same in both wills. As no reference is made in the last to the prior will, the papers themselves show nothing on that point.
It may be said of all' the papers prior to the last will that their effect to show the sense in which the testator finally used the. designation in question is a matter of interpretation for the court, and we do not find in this part of the evidence any application of the name “Ingleside” as the distinguishing name of any parcel of testator’s estate. Nevertheless, these documents were to be considered with the whole evidence by the jury, and we have to determine *163 whether their verdict was against the weight of the evidence thus taken together. We proceed to that question.
It appears that as early as the year 1860 measures were taken by the Levy Court for the establishment of a new county road south of the road which divided Ingleside when the testator purchased that estate, and contemplating the abandonment of the old one. It is between this new county road and the old road that the land in dispute lies; and the substantial question is, whether the testator had come, when he made his last will, to regard the parcel thus cut off by the new road as peculiarly appurtenant to the Mansion House, and as -finally constituting the estate to be known as Ingleside.
The defendant first produced the following deed executed by the testator on April 5,1860, and recorded September 6, 1860:
“This indenture, made this fifth day of April,in the year of our Lord (1860) eighteen hundred and sixty, between Hiram Walbridge and Jenny M., his wife, both of the city and county of New York of the first part, and the United States of the second part, witnesseth:
“That the Levy Court for the county of Washington, District of Columbia, are about to remove-a section of a road leading through the old race field'by Shoemaker’s mill for the purpose of getting a better grade; and, whereas, to effect the said change, the said party of the first part have agreed to convey the land occupied by the changed road to the United States for a public county road, the said Levy Court agreeing upon their part to make the said road and keep the same in repair and to forever relinquish any and all claims to the said party of the first part of all and every portion of the said road before it is changed, according to and in compliance with sundry resolutions passed at sundry times, which, by inspection of the books and proceedings of the said court will fully appear and explain. Therefore, witnesseth: That the said party of the first part, in consideration of one gold dollar to them in hand paid by the *164 Levy Court in behalf of the United States, the receipt of which is hereby acknowledged, have granted, bargained, sold, enfeoffed, and conveyed and confirmed to the United States for a county road, upon the conditions above expressed, the land held and contained in the following metes and bounds, to wit,” &c.
One of the conditions referred to in this release was that the old county road should be relinquished, and it thus appears, by his own instrument, that it was the intention of the testator at that time that the old county road should be obliterated, at least as a public dividing line. As to the effect of the change upon the private condition and arrangement of the testator’s property, Mr. George H. Plant who was then a member of the Levy Court, testified that the testator had said to him that he wanted to get the main road away from in front of his premises; that he expected to live there himself some time, and knew that the travel in front of his house would annoy him, and that he wanted to extend his front lawn. The same witness also testified that the testator, in a dozen conversations with him,always called the property down to the new road “Ingleside.”
Mr. S. P. Brown, also a member of the Levy Court from 1861 to 1869 or 1871, testified that General Walbridge consulted with him about the improvement of his property, and had said “that he was annoyed very much by teams going by there, and wanted to increase this property surrounding his house, so as to give him more room and get rid of this annoyance. He further stated that the testator, in repeated conversations with him, called the land down to the new road “ Ingleside,” and the land south of that road the “farm.” The same witness testified, on cross-examination, that the testator graded the disputed strip after the new road was made, and consulted him about making a circular road around his mansion and down to the new road.
S. W. Saxton testified that he had lived near the Walbridge property since 1869, which was in the life-time of the *165 testator; that the old county road was then overgrown wdth grass; that a hedge which ran along the north side of the new road was the inclosure of the grounds around the mansion occupied by the Walbridge family ; that, so far as appeared from an inspection of the property, the southern boundary of the property occupied by the Walbridge family, and included within the inclosure in which the Mansion House stood, was the new road; and, on cross-examination, the same witness stated that the land down to the new road, although not a distinct lawn, “ all seemed to be lawn to this hedge along the new road.” He added that “ on the upper part of it there may have been a little that was rough and had been cultivated.”
Albert Gleason testified that he rented the land south of the new road on March 1,1864, and occupied it between two and three years; that General Walbridge used to come over to the farm ; that he spoke of the property north of the new road as “ Ingleside,” and of that south as the farm he rented to witness.
Simeon Nelson testified that his father rented and occupied a place called the Walbridge farm just prior to 1870 ; that the boundary of the farm was the county road; that there was only one road, and witness* knew of no old county road. By further description the witness pointed out the new county road as the boundary.
Albert L. Sturtevant testified that he lived at Mt. Pleasant, and worked at “ Ingleside ” in 1866 and 1867; that the grounds north of the new road were inclosed and occupied by the Walbridge family in connection with the Mansion House.
Now, if the jury believed the testimony which we have recited, its tendency is plain. It tends' to show that, although 'the whole of the tract south of the old county road,-together with that portion of the Hewlings property which lay north of that road must, through his deeds'of purchase, have been known to the testator as “ Ingleside,” while the twenty acres *166 bought of Stone was known to him in the same way as part of “Pleasant• Plains” and “Slippery Hills,” he came to apply that name in a way of his own. There is, we understand, no dispute as to his applying it to the Stone tract as well as to some part of the original Hewlings tract; to what part of the latter is the only disputed question. The point here is, that he did not apply Ingleside as it had been applied in his title deeds, but in a way of his own; and, in the next place, that he had come to distinguish between what he called Ingleside and what he called his farm. Several witnesses testified that, in distinguishing between Ingleside and the farm, he was in the habit of including the land as far south as the new county road; in other words, the disputed tract. This is coupled with testimony tending to show that it was part of General Walbridge’s plan for making that property his own home to extend the mansion grounds south of the old road, and, indeed, as far as the new one.
If the proposed will of 1864 and trust of 1867 showed an intention that, in case of devolution to others, this extension should not be appurtenant to the mansion, it was for the jury to determine whether that intention indicated that the testator had not yet regarded it as so appurtenant. And if it indicated that he did not at those periods regard this land as surrounding or appurtenant to the mansion, it was for them to determine whether he had come to have a different view when he made- his last will. On this latter question a comparison of the two wills has a bearing.
In the will of 1864 the testator described the lands devised to7his wife as sixty acres lying north of the old county road; in his last will he described Ingleside, which he devised eo nomine as sixty-five acres. To meet this difference of measurement the plaintiff claimed that a resurvey showed that the land north of the old county road amounted to about sixty-five acres, and, therefore, satisfied the definition of Ingleside. But it is nothing to the purpose to show the actual *167 quantity, if the testator spoke on a different assumption. To him the number of acres contained in the .tracts purchased from Stone and from Hewlings, trustee, was known only by the maps attached to his deed of purchase, and in this way the aggregate was known as sixty acres. When he stated in his last will that Ingleside contained sixty-five acres, the jury had a right to believe that the testator intended to include more than what had been known to him as sixty acres. And if the jury believed - that the testator was aware that sixty-five acres carried Ingleside south of the old road they had a right to determine whether the additional five acres was his approximate estimate of the strip between the old and the new roads. Again, they had a right to consider the value and meaning of this statement of the number of acres in connection with the testimony concerning the testator’s habit of describing Ingleside. We have no right to disturb their conclusions upon these questions, unless we find that it was clearly against the weight of the evidence; and we are of opinion that if they believed the testimony concerning the testator’s manner of speaking of Ingleside, they could find no other verdict. We hold, then, that Mrs. Walbridge acquired title to the premises in dispute by the last will of General Walbridge.
This brings us to another and very interesting question.
It is claimed by the plaintiff that, if the testator, did devise the land in dispute to his wife, it descended to her daughter, Mrs. Corkhill, as her sole heir; that, by a certain deed of bargain and sale, the latter conveyed it to Heman D. Walbridge, and that he conveyed it to the plaintiff; so that the plaintiff has a legal title on which he must recover. This proposition requires a statement of the transactions to which it refers.
It will be remembered that the legacy of $110,000 to Mrs. Walbridge was charged upon the devises to the testator’s brothers. To secure the payment of $80,000 of this amount, Heman D. Walbridge executed to Mrs. Walbridge on the *168 6th of ^December, 1872, a mortgage, in which he described the mortgaged premises in terms which clearly included the land in dispute as a part of the farm devised to himself. His mortgage contained covenants of title and the usual reservation of the'mortgagor’s right of possession until default. As a matter of fact, this disputed strip was then in Mrs. Walbridge’g possession, and has never been in the possession of the mortgagor or of his grantee, the plaintiff. On the same day Mrs. Walbridge executed a release of the remaining property devised to the testator’s brothers from the charge imposed by the will.
Mrs. Walbridge died and Mrs. Helen B. Corkhill, her daughter, became her sole heir and her administratrix.
The notes secured by the above mortgage were not fully paid at maturity, and a new arrangement seems to have been made between Mrs. Corkhill'and the mortgagor. On the 6th day of April, 1877, they executed an instrument which recited the fact of the mortgage, the description of the mortgaged premises contained therein, the satisfaction of the mortgage debt, the right of the mortgagor to a re-conveyance,. and to have the premises “ released and discharged from all lien, claim, &c., by reason of said mortgage deed, and then proceeded as follows.
“ Now, therefore, this indenture witnesseth : That the said party of the first part (Mrs. Corkhill) for and in consideration of the premises, and further of the sum of one dollar, &c., has granted, bargained, sold, released, and conveyed, and doth grant, &c., unto the said party of the second part, his heirs, &e., all. the hereinbefore-described premises, &c. To have and to hold the same unto and to the use of the said party of the second part, &c., as in his first and former estate, free, released, and discharged of and from all lien, claim, or incumbrance by reason of said mortgage deed.” This instrument was signed and sealed by “Helen B. Cork-hill, mortgagee,” and “Helen B. Corkhill and Hernán D. Walbridge, administrators of Jane M. Walbridge,” but was acknowledged only by Helen B. Corkhill.
*169 On the same day Heman D. Walbridge and wife executed to George W. Riggs and George M. Wright a deed in trust to secure payment of a promissory note of Heman D. and Horace S. Walbridge to Helen B. Corkhill for $25,000. This deed contained in its recital of the mortgage the same words of description which were used in the mortgage.
On the 25th day of August of the same year (1877) He-man Walbridge executed a conveyance to Horace Walbridge describing the same land, and thus including the premises in dispute. The above note for $25,000 being paid, Wright, the surviving trustee, executed on the 12th day of March, 1884, a deed releasing and conveying the premises to Horace Walbridge. Afterwards, on the 4th day of April, 1884, Heman Walbridge again executed a deed purporting to convey the premises to Horace Walbridge, the plaintiff.
This statement will explain the instructions which were asked by the plaintiff and were refused by the court. They contained, substantially, the following propositions:
1. That the deed from T. B. A. Hewlings and others to Hiram Walbridge, dated May 14,1855; the deed from Helen B. Cprkhill to Heman Walbridge, dated of April 6,1877,, and the deeds from Heman to Horace Walbridge, dated respectively 27th August, 1877, and 4th April, 1884, taken in con-' nection with the proof that Jane Walbridge, devisee .of Hiram, died intestate, and that said Helen B. Corkhill, as her sole heir at law, inherited from her said mother whatever estate in the premises the said Jane derived under the wiíl of the said Hiram, and also in connection with the provisions of the said will devising the “ farm ” to said Heman D., and “ Ingleside ” to the said Jane, establish by uncontradicted, evidence, that at the commencement of said suit the legal title to the premises in dispute was in the plaintiff; and this, whether such premises passed by said will to said Heman as part of the “ farm,” or to the said Jane as part of the tract known as “ Ingleside.”
2. That in view of the uncontradicted evidence stated in *170 instruction No. 1, the defendants in this suit, and all parties claiming under the last will of Helen B. Corkhill, are es-topped from denying that the said deed of 6th April, 1877, from the said Helen to the said Heman Walbridge, and the said deeds of 27th August, 1877, and 4th April, 1884, from the said Heman to said Horace Walbridge, the plaintiff, had together the effect of releasing and conveying to the plaintiff whatever title, if any, was held by said Helen in the premises in dispute, through and under the said will of Hiram Walbridge.
3. That the acceptance by the said Jane Walbridge of the mortgage dated 6th December, 1872, made to her by said Heman, and embracing the premises in dispute, taken in connection with the deed from Helen B. Corkhill to said Heman, dated 6th April, 1877, and in connection with the other undisputed evidence in the case, work an estoppel in favor of the plaintiff, whereby the defendants are estopped from controverting the title of the plaintiff in the disputed premises.
We have already considered the bearing of the testator’s deed of purchase upon the meaning of his last will, and the questions of fact involved in the verdict. The only other question raised by the prayers for instruction above stated, is the operation of Mrs. Corkhill’s deed of 6th September, 1877, to Heman Walbridge.
It is insisted, on the part of the plaintiff, that this deed and the mortgage to which it refers describe the premises in dispute, and that, therefore, if Mrs. Corkhill acquired the legal title to the premises under the will, the thing bargained and sold was the legal title so acquired. Counsel say: “ Our proposition of law is, that this is not a> mere release of a mortgage, but is a deed whose face makes it a conveyance of a bargained and.sold title which the grantor, by his deed, purported to have, and is a grant which operates to convey the premises described (here including the premises in dispute); and such grant works an estoppel against *171 the grantor, and all holding under the grantor, against asserting any claim to said premises so bargained, sold, and conveyed.” In support of this proposition he cites the familiar cases of Van Rensselaer vs. Kearney, 11 How., 322, and Bush vs. Person, admr., 18 How., 85, where the Supreme Court said: “If a deed bear on its face evidence that the grantor intended to convey, and the grantee expected to .become vested with an estate of a particular description or quality, and that the bargain had proceeded upon that footing between the parties, then although it may not contain any covenants of title in the technical sense of the term, still the legal operation and effect of the instrument will be as binding on the grantor and those claiming under him, in respect to the estate thus described, as if a formal covenant to that effect had been inserted; at least so far as to estop them from ever afterwards denying that he was seized of the particular estate at the time of the conveyance.” He further cited the case of French’s Lessee vs. Spencer, 21 How., 240, where the same court said: “But the rule has been carried farther, and it is now established that when the grantor sets forth on the face of his^conveyance by averment or recital that he is seized of a particular estate in the premises, and which estate the deed purports to convey, the grantor and all persons in privity with him shall be estopped from ever afterwards denying that he was seized and possessed at the time he made the conveyance. The estoppel works upon the estate and binds an after-acquired title as between the parties and privies.”
If these very familiar principles-of modern conveyancing were applicable to the particular question which is presented by Mrs. Corkhill’s deed, it would be of easy solution. But this is not a question of after-acquired estate nor whether a deed shall have the effect that it purports to have; it is a question of construction. Undoubtedly a grantor is estopped to deny that hi's deed actually conveyed what it purported on its face' to convey, but this principal does not estop him *172 to deny that it did purport on its face to convey the interest alleged by the grantee. The very authorities referred to by the plaintiff insist upon this distinction, and deal first with the-question of construction. The plaintiff himself discussed it. He begins with the following statement of the purport of the deed : “ That the deed of Mrs. Corlchill represents her as possessed of the title to the land covered by the deed to Morsell of the 12th day of May, 1855, is plain and express on the face of the deed. It says that she is the mortgagee of that land; meaning, of course, mortgagee as the only heir of the real mortgagee, her mother. It sets forth that unto her mother the mortgage of Hernán D. Walbridge of the 6th of December, 1872, * * * conveyed the premises, described in said deed of May 12,1855, to Morsell. It then recites that Mrs. Corlchill is the only child and sole heir of the said Jane M., and that, by reason of the payment of the mortgage, the parties were entitled to a reconveyance of the said described premises, and to have the lien discharged, and, therefore, it proceeds to. grant, as above quoted, the specific and exact premises conveyed by the deed of the 12th of May, 1855, to Morsell.”
The recitals of a deed could hardly show more distinctly the limitations and particular nature of the interest which the bargainor held and purported to convey. This deed recited that Mrs. Corlchill had acquired from the bargainee legal title in mortgage, and that, by payment of the mortgage debt, the bargainee had acquired a right to a reconveyance of that title, and the bargain and sale distinctly purports to convey just what the mortgagee was entitled to have again. This, of course; was whatever had come to the bargainor by the mortgage, and did not include any interest which the bargainor did not derive from the mortgagor, but had independently. Although the mortgage be a legal title, it is not the fee simple absolute of the land, and language in a deed which might be sufficient to convey the latter, will nevertheless be construed as purporting to convey only *173 the former if that intention is shown by recitals, or by anything within the four corners of the deed. This distinction of the subject-matter of the bargain' is maintained in States where a mortgage is held to be a conveyance. Merrett vs. Harris, 102 Mass., 492, and Barnstable Savings Bank vs. Burrett, 112 Mass., 172; Pomeroy’s Eq., Secs. 820 and 972.
The authorities referred to were cases of assignments, but the principle of construction there applied in ascertaining the subject-matter of the bargain and sale is just as applicable when the bargain is between the mortgagee and mortgagor. The question in both cases is, wdiether the bargain appears, upon the whole instrument, to relate to the mortgage title or to the fee simple absolute of the land. Applying this question in the present case, we think it is plainly and expressly shown by the recitals in Mrs. Cork hill’s deed that the bargain and sale related only to the mortgage interest. What is the legal result of this construction of the deed? We think it is clear that the mortgagor, after receiving this re-conveyance, stood just as he did before he executed the mortgage. He acquired thereby no title that he did not have before, and the bargainor sold and parted with nothing which she did not derive from the mortgagor; and this simply because the bargain and sale did not purport to concern anything but the interest so derived. Inasmuch as she derived by that mortgage neither possession nor title to the premises in dispute, but had all the time held these as her own, those rights were not included in the bargain relating to the mortgagor’s interest. In short, he did not acquire title to the premises in dispute by this deed.
It is worth while, perhaps, to add a single observation. The mortgage included land which undisputedly belonged to the mortgagor; and as to this the re-conveyance or bargain could only operate as a release. It would hardly seem consistent to hold that the same instrument purported to be a bargain and sale of the mortgage interest as to one portion and a bargain and sale of the fee simple absolute as to another portion of the land described.
*174 Exception was reserved as to the admission of evidence to show that Mrs. Corkhill executed this deed in ignorance that the description included the premises in dispute. We question the admissibility of such evidence, but, inasmuch as we hold that no title to the land in dispute passed by this bargain and sale, we think that the admission of evidence tending .to show that it passed by mistake could not affect the verdict. The actual verdict would still be the proper one if this evidence had been excluded.
Judgment affirmed.